**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0489-21

ROMSPEN MORTGAGE LIMITED
PARTNERSHIP,

    Plaintiff-Respondent,

v.

AURA DEVELOPMENT GROUP,
LLC,

    Defendant-Respondent,

and

AURA INVESTORS, LLC and
THIRD STATE INVESTORS, LLC,

    Defendants-Appellants.

_____

Argued October 2, 2023 – Decided January 22, 2024

Before Judges DeAlmeida, Berdote Byrne, and
Bishop-Thompson.

On appeal from the Superior Court of New Jersey,
Chancery Division, Gloucester County, Docket No. C-
000054-17.

Robert Vincent Dell'Osa argued the cause for appellants (Cozen O'Connor, attorneys; Robert Vincent Dell'Osa, of counsel and on the briefs).

Michael R. Yellin argued the cause for respondent (Cole Schotz, PC, attorneys; Michael R. Yellin, of counsel and on the brief; Arnold Paul Picinich, III, on the brief).

PER CURIAM

This case involves the priority of liens amongst three parties with respect to the last two parcels of land in a residential development project. Third State Investors, LLC (Third State) and Aura Investors, LLC (Aura Investors) (collectively "appellants") appeal the trial court's grant of reconsideration in favor of plaintiff and argue the trial court erred in granting Romspen an equitable mortgage and second priority lien because actual, not constructive, notice of a mortgage is necessary, and erred in failing to grant their motion for reconsideration. We find no basis to disturb the trial court's findings and affirm.

I.

Romspen Mortgage (Romspen) is an Ontario limited partnership. Aura Development Group, LLC (ADG) is a New Jersey limited liability company, half-owned by John B. Canuso, Sr. (Canuso) individually and half by Canuso through Aura Investors. Canuso also owned Canuso Communities Corp., which was ADG's non-member manager and a guarantor.

2

Canuso intended to assemble eight contiguous parcels in Glassboro and Elk for development as "Aura," an integrated residential community consisting primarily of single-family homes. He acquired the parcels in Glassboro, comprising parcels A through E, along with parcel F-1 in Elk.

The purchase agreements for parcels F-2, G, and H.

Canuso wanted to purchase parcels F-2, G, and H, located in Elk, with Romspen funding. In 2003, Canetic Land LLC (Canetic), another Canuso entity, entered a contract to purchase parcel F-2 from Orleans Homebuilders, Inc. (Orleans). On February 10, 2012, Latham Investors, LLC (Latham), yet another Canuso entity, entered into a contract to purchase approximately 442 acres in Elk from Orleans. The land comprised parcels G and H, which totaled approximately 95 acres, plus approximately 350 additional acres that were never intended to be part of the Aura project. Canetic assigned its contract rights to purchase parcel F-2 to ADG. Canuso, through Latham, similarly assigned ADG its contract rights to purchase G, H, and the additional acreage from Orleans.

The loan commitment letter.

An internal Romspen email, written by Thomas Conwell (Conwell) on January 9, 2013, described the Aura project as the development of residential lots for bulk sale to home builders. He noted ADG's $13 million loan request

3

was divided between a term loan "to repay existing bank loans and complete the purchase of some lots that are under contract" and a revolving loan "for development and approval costs on groups of lots prior to sale."

On April 8, 2013, Romspen sent Robert Swartz (Swartz), ADG's attorney, a loan commitment letter (the commitment letter), executed on April 9, naming ADG as the borrower. The "approved loan amount" of $13 million was allocated between a term loan of $8.5 million and a revolving loan of $4.5 million. For the term loan, approximately $3,762,000 of the initial advance would be used "to repay existing registered mortgages and to assist in acquiring additional lands . . . in accordance with a schedule to be agreed to by Lender," while approximately $4,245,000 would be advanced in increments "to assist in further repayment of existing registered mortgages and to assist in acquiring further additional lands." Revolving loan proceeds would be advanced as needed "to fund the cost of site improvements, interest, approvals, overhead, and related costs." The "Property," which would serve as loan collateral, was defined as parcels A through H.

The loan was to be secured by a promissory note and a $13 million "first mortgage lien and fixture filing, and other security satisfactory to Lender's

4

attorneys, in the amount of $13,000,000, on the Property."  The commitment letter also stated, separately and in boldface:

> **No secondary financing with respect to the Property or the Acquired Assets shall be permitted at any time during which the Loan remains outstanding, without Lender's express written consent.**

The Romspen loan, mortgage, and related agreements.

ADG and Romspen entered into the loan agreement on May 16, 2013 (loan agreement), which incorporated "all covenants, agreements, representations and warranties made" in connection with it.  The term loan of $8.5 million was for ADG to acquire parcel F-2 and parcels G and H pursuant to the purchase agreements assigned to ADG, with the revolving loan of $4.5 million to fund development.

The loan agreement required ADG to grant Romspen a first mortgage, as well as a "first lien security interest" in all "after acquired property . . . immediately upon acquisition of same."  The "future property" provision prevented ADG from altering its purchase agreements for parcels F-2, G, and H without Romspen's permission.  It also required ADG to give Romspen a lien on those parcels "[s]imultaneously with the acquisition by Borrower of any of" them.

A-0489-21

The loan agreement required ADG to sell lots worth $1.2 million to home builders within a year of the loan closing and made ADG's failure to do so an event of default. ADG would also be in default if it transferred any interest in any part of the Property without Romspen's approval. "Transfer" was defined broadly to include:

> any transaction pursuant to which any Person is granted an option to purchase all or any portion of the Property or any direct, indirect or beneficial interest in Borrower; and . . . any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by Borrower, directly or indirectly, whether through an ownership interest, contract right or otherwise.

An unapproved transfer would allow Romspen to declare all outstanding obligations immediately due and payable, even without a demonstration of "any actual impairment or prejudice of its security or any increased risk of default hereunder."

The loan agreement further required ADG to assign to Romspen its rights pursuant to its purchase agreements for parcel F-2, G, and H, "as security for the Loan." It is undisputed ADG was expected to be the purchaser of all three parcels, and the assignment to Romspen was intended to allow it to ensure completion of the Aura project if ADG failed to purchase the parcels.

6

ADG also issued Romspen a term promissory note and a revolving promissory note. On May 17, 2013, ADG granted Romspen a mortgage, which was the "Security Instrument" named in the loan agreement. The mortgage covered the entire "Property," which comprised both the "Land," meaning parcels A through F-1, and the "Additional Land," defined as "[a]ll additional lands, estates and development rights hereafter acquired by" ADG. The Additional Land could also, "by supplemental mortgage or otherwise[,] be expressly made subject to the lien of this Security Instrument." The mortgage obligated ADG to record or file it in any manner and place that was required "to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property."

The mortgage was recorded after the closing, but only for parcels A through F-1. The parties do not dispute or explain ADG's failure to record the mortgage on parcels F-2, G, and H, to record the purchase agreements for them that ADG assigned to Romspen, or to record the loan agreement with respect to any of the parcels as required by the loan documents.

The parcel F-2 closing, and ADG's first inquiry to Third State.

On October 14, 2013, ADG exercised its option to purchase parcel F-2 from Orleans. Romspen and ADG amended the mortgage to reflect their

7

execution of the "spreader" agreement, which spread the mortgage and the Security Instrument to parcel F-2. The "spreader mortgage" was recorded.

On January 13, 2014, Stephen Patron (Patron), a real estate consultant to Third State, sent an email to Canuso and Swartz to thank them for meeting with him and "sharing the details of your project." Patron had questions about the land, improvements, and construction costs—one of which was whether parcels G and H could be purchased without Romspen funds. Swartz replied it could be done, but "there are costs, approvals and improvements that have already been funded by Romspen and we would anticipate they will require a release that will have to be negotiated with them."

ADG's loan defaults, including its failure to purchase parcels G and H.

On August 7, 2014, Conwell sent ADG an email noting it failed to sell $1.2 million in lots to home builders within a year of the loan's closing, the failure was a default, and he was "going to call [Canuso] and express [his] profound disappointment with how this is going." After December 2014, ADG failed to pay loan interest. The record does not indicate Romspen enforced those defaults by modifying its agreements with ADG or imposing any consequences.

On January 21, 2015, Orleans sent ADG a default notice pursuant to the purchase agreement for parcels G and H because it failed to purchase them by

A-0489-21

May 20, 2014. Orleans gave ADG fifteen days from the date of that notice to cure the default by closing on them. Orleans also notified Romspen of the default, pursuant to ADG's assignment of the purchase agreement to Romspen and extended to Romspen the same fifteen days as ADG's lender to cure the default.

Formation of Aura Investors to purchase parcels G and H.

In April 2015, Third State and Latham, a Canuso entity, agreed to form Aura Investors to "purchase, own, hold for investment and possible resale building lots in a community to be known as 'Aura.'" They were the only members, with Third State having a sixty-five-percent interest and Latham having a thirty-five-percent interest.

On April 28, 2015, Third State's counsel emailed Swartz about two proposed amendments to the purchase agreement for parcels G and H. One would extend the closing date and the other would expand the agreement to include "the adjacent 350-acre parcel," the "option" portion. On April 28, 2015, ADG and Orleans entered into an agreement of sale by which ADG would purchase the entire 442 acres for $3,390,000. However, on May 6, 2015, Swartz emailed Third State stating ADG would not participate in the purchase, and

9

A-0489-21

ADG would instead assign "the Orleans agreement" to "the new entity" Aura Investors.

Communications between ADG and Third State about cost-sharing.

One element in Aura Investors' purchase of parcels G and H was the need to reimburse Romspen for the benefit its cost-sharing advances conferred on those parcels—the costs ADG and Third State discussed in January 2014. The parties do not dispute Romspen had a legitimate interest in such reimbursement, even if those parcels were purchased without Romspen funds.

On May 15, 2015, Third State's counsel sent Patron a "revised due diligence checklist." One attachment was a "cost share contribution analysis" for the Aura project, which listed nine expense items amounting to $2,759,086, and posited that certain parcels, presumably parcels G and H, received 49.27% of the benefit from them, the equivalent of $1,596,097. That same day, Patron emailed Canuso and Swartz to request an explanation of "the $1.5M and $500k reimbursable/contributions for Aura." Canuso replied and stated the $1.5 million was for parcels G and H. The $500,000 was for the option portion and therefore did not involve Romspen.

On May 29, 2015, Swartz emailed Patron, Canuso, and Brian Sattinger (Sattinger), a representative of Third State, in response to a Third State inquiry

A-0489-21

about "the need for $1.5M now." Swartz related Canuso's explanation that ADG needed the $1.5 million "to be released now in order to satisfy commitments." Sattinger then inquired into the commitments and penalties for missing payment of the $1.5 million. Swartz replied to Sattinger, Patron, and Canuso that "[w]e committed a large sum to Romspen directly . . . ."

Communications between ADG and Romspen.

In the interim, on May 1, 2015, Conwell emailed Canuso and Swartz about ADG's request to reallocate certain expenses from the term loan to the revolving loan, in part to preserve $1.59 million in advanceable funds under the term loan "to acquire [a]reas G&H In [sic] Elk from Orleans." Conwell noted ADG was in default pursuant to the loan agreement for several reasons, including its failures to pay loan interest since December 2014; to sell lots to developers at the rate the loan agreement required; and to acquire parcels G and H. He added ADG "allowed the purchase contract with Orleans . . . to expire, and without those lands, our analysis shows that it is unlikely that you can repay the loan." Conwell declared ADG's purchase agreement for parcels G and H "must be reinstated," for Romspen to consider making further advances pursuant to the loan agreement. He reminded ADG, "[i]f you acquire those lands with outside capital, Romspen will receive a first mortgage on them." On May 4, 2015,

11

Canuso replied Orleans was requiring ADG purchase the 350-acre option portion along with parcels G and H, and Romspen's lack of interest in funding the option required ADG to consider outside funding.

Swartz later emailed Conwell and Donovan to request an advance to "keep things moving." On May 29, 2015, Conwell responded with a list of loan requirements ADG would have to satisfy before Romspen could "process" the request. Relevant to the issues before us, one of the requirements consisted of purchasing parcels G and H, and Conwell reminded Swartz that Romspen would get a first-priority lien on them regardless of the funding source: "The contract with Orleans Builders for Areas G&H in Elk must be reinstated. Nothing received. If you acquire those lands with outside capital, Romspen will receive a first mortgage on them."

Aura Investors' purchase of parcels G and H with Third State funding.

On May 29, 2015, Aura Investors purchased parcels G and H and the option portion from Orleans, with an agreement that had several components. The first component was an assignment agreement by which ADG transferred to Aura Investors the right to buy the three parcels. The second was the deed of sale, which stated the sale price of $3,390,00 was fully paid. The third component was the mortgage Aura Investors granted to Third State. The

12

agreement explained Third State provided $5.1 million in "Purchase Money Funding," but only part of that amount represented the purchase price and transaction costs; the remainder was for reimbursing "Canuso and its Affiliates" for development expenses already incurred. In addition, Third State was to make a further $1.1 million available for "other hard costs it or they paid towards the purchase and development of" the parcels.

The mortgage gave Third State a first-priority lien and security interest on parcels G and H and the option portion, and on all the improvements and other physical and legal appurtenances, to secure payment of the purchase money funding. For all obligations to Third State other than for the purchase money funding, Third State received a second-priority lien. On June 8, 2015, Third State recorded its mortgage on parcels G and H and the option portion. Appellants represent Third State performed a title search on parcels G and H and found no recorded liens.

Communications between the parties after the purchase.

On June 4, 2015, Swartz sent Conwell and Donovan an e-mail repeating his prior statement that Orleans "required the purchase of the entire parcel," and he informed them that, "[w]ith the assistance of an investor, we have taken title

13

to the property." He added the investor was also providing "approximately $2 million in cost sharing/reimbursement."

On June 8, Swartz emailed Conwell and Donovan a "cost share contribution analysis" similar to the version Patron had received on May 15, although there were seven items instead of nine, and their total value was lower, which reduced the value of the 49.27% of the benefit parcels G and H received from them to $1,359,433. The remainder of the approximately $2 million for reimbursement was allocated to the option portion, and thus of no interest to Romspen.

Canuso and Romspen remained in communication into 2016 but were unable to resolve the cost-sharing issues. On August 18, 2016, Romspen filed suit. In discovery, Donovan certified ADG told Romspen it might seek outside funding for the purchase of "certain additional properties," but not for the purchase of parcels G and H.

Patron certified that "Swartz presented limited information" to Third State during the January 2014 discussions by failing to indicate Romspen had any interest in parcels G and H, or that Romspen would have an interest in them even if it did not fund their purchase. Patron added he and others "engaged in due

14

A-0489-21

diligence," and no "publicly available document" showed Romspen owned any interest in those parcels.

Donovan provided another certification to explain the appropriateness of Romspen's contractual right to receive a first mortgage on parcels G and H when ADG acquired them. He certified an eventual first mortgage on G and H was "a material inducement" for Romspen to let loan proceeds be used to benefit parcels ADG did not yet own as of the loan's effective date. The purpose of the mortgage on those parcels from inception was "to prevent ADG from using Parcels G and H to obtain additional senior financing and dilute the value of Romspen's collateral."

Summary judgment.

The trial court noted ADG began negotiating with Romspen in 2012 to fund the acquisition of parcels F-1, F-2, G, and H for the Aura project and to fund various future development expenses. On May 16, 2013, they entered into a loan agreement and closed on a loan worth $13 million dollars. The loan agreement provided all of parcels—A through H—were to serve as collateral in one manner or another. ADG would give Romspen a mortgage on parcels A through F-1 at closing, and it would "grant Romspen a first mortgage on Parcels F-2, G, and H if and when it took title."

15

The assignment agreement signed by ADG and Romspen declared it was binding on ADG, "its successors and permitted assigns and any subsequent owner of" the parcels. It named the purchase agreements and all ADG's rights pursuant to those agreements as "additional security" for the loan. It required ADG to inform Romspen "promptly" of "all material changes in or amendments to the Collateral." When ADG closed on parcel F-2 in October 2013, the mortgage was modified by a "spreader" agreement that extended it to that parcel and was recorded. When ADG defaulted by failing to purchase the additional lots, the court observed Romspen did not require ADG to close within the contractual grace period and neither ADG nor Romspen exercised the right to cure.

The trial court noted Romspen began this action to impose "an equitable first mortgage lien" on parcels G and H, and a parallel action "to foreclose its mortgages on Parcels A through F." By that time, Third State had advanced ADG an additional $1.1 million in cost-sharing/reimbursement in addition to the purchase money for parcels G and H. Third State also advanced $3.7 million for "site improvements."

The court declared Romspen and Third State "to be equally sophisticated in the realm of commercial mortgage financing," and thus outside "the mold of

16

those financially strapped property owners for whom the court's equitable powers exist." While Canuso and Swartz "lulled" Romspen "into non-action," Romspen's own lassitude weighed against it, as it failed "to timely record its interest" in parcels G and H, "give notice of its continuing interest to Orleans," exercise its right to close on those parcels pursuant to ADG's original purchase agreement with Orleans, or "require ADG to acquire" them "with Romspen funds."

However, the court found, as parties related to ADG, Aura Investors' imputed knowledge and Third State's constructive notice of Romspen's interest in Parcels G and H, weighed in favor of granting an equitable mortgage. In particular, defendants knew Swartz communicated Romspen would require a release for approvals and improvements that benefitted Parcels G and H. Swartz's invocation of a "release" implied Romspen had a lien on the parcels for those expenses, and "Third State should have insisted that Latham/ADG/Mr. Canuso provide proof of payment and non-lien status of the items listed for cost-sharing/reimbursement."

The court explained Romspen would be entitled to a first mortgage on parcels G and H if they were acquired with funds Romspen advanced after the loan closing in exchange for ADG's promise at the closing of such a lien. That

A-0489-21

lien would have priority over liens on those parcels securing anything other than the purchase funds, even if such liens were recorded earlier.  However, it was Third State that actually provided the purchase funds, and until Romspen began this action, Third State lacked actual knowledge of the loan agreement from which Romspen claimed an equitable mortgage.  Romspen should have recorded the loan agreement and otherwise publicized and protected "its continuing legal interest" in parcels G and H.

In contrast, Third State's actual knowledge of Romspen's interest in those parcels was limited to the cost-sharing items Romspen funded.  The court thus found Third State "should have insisted" Canuso and his entities prove the absence of liens on those parcels that were related to the cost-sharing expenses, namely, "approvals and improvements that benefitted Parcels G and H."

The court found the balance of the equities favored Third State until it had actual notice of Romspen's claim to an equitable mortgage and rendered summary judgment in part, assigning lien priorities on parcels G and H as follows:  first priority to Third State for the purchase funds; second priority to Third State for the sums it advanced for cost-sharing and site improvements "after recordation of its mortgage and before actual notice of Romspen's claim to an equitable mortgage" based on the loan agreement; third priority to

18

Romspen's "equitable mortgage in an unknown amount"; and fourth priority for any funds "advanced by Third State after the date it was served with the complaint" in this action.

First motion for reconsideration by Romspen.

Romspen moved for limited reconsideration, which was partially granted. The court explained if a party contemplating the purchase of land has information which is "sufficient to apprise him of the existence of an outstanding claim," and if "reasonable investigation" would "necessarily [lead him to] discover the existence of such a claim," that party is on constructive notice. A party with information sufficient to afford notice does not have the status of "a bona fide purchaser that would take free of the claim."

The court candidly admitted it made a mistake and reversed itself, finding Aura Investors had information "sufficient to apprise" it of Romspen's "unrecorded interest" in parcels G and H before the closing. It cited the emails prior to closing that recognized Romspen already funded "cost approvals and improvements" for which it would "require a release"; the May 15, 2015, email from Patron to Canuso asking for "a list of items that account for the 1.5[M] and 500K reimbursement/contribution for Aura"; and Canuso's May 20, 2015, reply to Patron with the breakdown of the "estimated cost sharing contribution" for

19

parcels G and H.  It also cited a May 29, 2015, exchange about cost-sharing in which Sattinger, the Third State representative, asked Swartz "what are the penalties for missing" the "commitment" to reimburse Romspen.

The court viewed the sum of those communications as sufficient information to "apprise" Aura Investors "of Romspen's interest in the parcels that were being purchased."  The court again found Romspen had an equitable mortgage on parcels G and H to the extent of the reimbursement ADG owed it. The court made Romspen's equitable mortgage second only to Third State's purchase money mortgage, demoting to third priority the Third State mortgage "for all other sums advanced for cost sharing and improvements."

Defendants' reconsideration motion.

Defendants then moved for reconsideration, arguing "the award of an equitable mortgage to Romspen was contrary to the contractual intent of ADG and Romspen," which the trial court denied.  The court observed after ADG's subsequent purchase of parcel F-2 with Romspen funds, ADG executed a "spreader of mortgage."  The court reaffirmed its finding on summary judgment that "Third State's due diligence into the cost-sharing/reimbursement for approvals and improvements on other parcels that benefitted Parcels G [and] H should have included proof that ADG actually funded and paid for the approvals

20

and other third-party activities that benefited Parcels G [and] H." That would have confirmed another party did not have a lien against the parcels. It reiterated "Third State had constructive notice of Romspen's right to a lien on Parcels G and H before Third State recorded its mortgage on Parcels G and H." The court found Aura Investors and Third State failed to demonstrate why the court's interpretation or reliance on this evidence was incorrect and rejected "by clear and convincing evidence" the argument Aura Investors and Third State already made and lost at summary judgment, without presenting new evidence.

## II.

Summary judgment should be granted when the record as a whole "show[s] that there is no genuine issue as to any material fact challenged." R. 4:46-2(c). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Samolyk v. Berthe, 251 N.J. 73, 78 (2022) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). We review grants of summary judgment "de novo, applying the same standard used by the trial court." Ibid.

A motion for reconsideration from a final order pursuant to Rule 4:49-2 is to be granted "for good cause shown and in the service of the ultimate goal of substantial justice." Casino Reinv. Dev. Auth. v. Teller, 384 N.J. Super. 408, 413 (App. Div. 2006). The moving party must "state[] with specificity the basis on which [the motion] is made" and supply "a statement of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred . . . ." R. 4-49:2.

A motion for reconsideration is "an opportunity to seek to convince the court that either 1) it has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the court either did not consider, or failed to appreciate the significance of probative, competent evidence." Kornbleuth v. Westover, 241 N.J. 289, 301 (2020) (quoting Guido v. Duane Morris LLP, 202 N.J. 79, 87-88 (2010)). In addition, "the magnitude of the error cited must be a game-changer for reconsideration to be appropriate." Palombi v. Palombi, 414 N.J. Super. 274, 289 (App. Div. 2010).

To establish such a basis for granting reconsideration, the movant may "bring new or additional information to the Court's attention which it could not have provided on the first application . . . ." Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria, 242 N.J. Super. at 401-02); see also

22

Cap. Fin. Co. of Del. Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310-11 (App. Div. 2008) (court abused its discretion by declining to consider new evidence "presented . . . on the motion for reconsideration in furtherance of [the movant's] argument that the judge had expressed his decision on an incorrect basis"). Nevertheless, the movant may not offer a "new theory" on "factual predicates" available when the court decided the prior motion. Cummings, 295 N.J. Super. at 384-85.

We review motions for reconsideration for abuse of discretion. Kornbleuth, 241 N.J. at 301 (quoting Hous. Auth. of Morristown v. Little, 135 N.J 274, 283 (1994)). This may be established by "plainly incorrect reasoning or failure to consider evidence," or disregard of "a good reason for the court to reconsider new information." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 4:49-2 (2023).

Appellants contend Romspen did not intend to have a mortgage over the additional sums expended on parcels G and H and therefore it is not entitled to an equitable mortgage or lien, although it may be entitled to a monetary amount for its contribution. We disagree as their argument is belied by the record and the controlling documents conclusively demonstrate otherwise.

23

The loan commitment letter noted ADG's $13 million loan request was divided between a term loan of $8.5 million to repay existing bank loans and complete the purchase of some lots that were under contract and a revolving loan of $4.5 million "for development and approval costs on groups of lots prior for sale." For the term loan, approximately $3.8 million of the initial advance would be used "to repay existing registered mortgages" while approximately $4.2 million would be advanced in increments "to assist . . . in acquiring further additional lands." Revolving loan proceeds would be advanced from time to time "to fund the cost of site improvements, interest, approvals, overhead, and related costs."

The loan would be secured by a promissory note and a $13 million "first mortgage lien and fixture filing . . . in the amount of $13,000,000, on the Property." The commitment letter also stated, separately and in boldface, no secondary financing with respect to the Property would be permitted while the loan remained outstanding without Romspen's express written consent. The final loan document stated the term loan of $8.5 million was so ADG could acquire parcel F-2 and parcels G and H pursuant to their purchase agreements, and the revolving loan of $4.5 million was to fund future development.

The loan agreement required ADG to grant Romspen a first mortgage in all "after acquired property . . . immediately upon acquisition of same." It also required ADG to give Romspen a lien on those parcels "[s]imultaneously with the acquisition by Borrower of any of" them. The loan agreement required ADG to assign to Romspen its rights pursuant to its purchase agreements for parcel F-2 and for parcels G and H, "as security for the Loan." When ADG granted Romspen a mortgage, which was also designated as the "Security Instrument" named in the loan agreement, the mortgage covered the entire "Property," including "[a]ll additional lands, estates and development rights hereafter acquired by" ADG. The mortgage placed the obligation on ADG to record the mortgage in any manner required "to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property."

It is disingenuous for Aura Investors, partially owned by Canuso, to claim it did not have notice of Romspen's actual mortgage on parcels G and H. Canuso negotiated the Romspen loan documents as owner of ADG containing those specific terms. There can be no doubt Aura Investors had actual knowledge of its obligations pursuant to the loan agreement, which included pledging G and H as collateral for the loan and recording all of the loan documents.

25

Additionally, at the time Aura Investors closed on parcels G and H, Third State knew and accepted Romspen's claim of a lien on parcels G and H, even if Third State can be said to have lacked "actual" knowledge of it despite its status as co-member of Aura Investors. Canuso's ownership interest in Aura Investors owed it a fiduciary obligation to its member Third State to disclose the loan documents. Such knowledge correctly caused the court to give Romspen's lien a higher priority than Third State's lien for advances other than purchase funds.

Equity will not allow a contract purchaser of realty to nullify a mortgage by a contrivance, as ADG's assignment of the purchase agreement for parcels G and H to Aura Investors attempted to do. Equity allows the application or extension of a mortgage to after-acquired property in these circumstances to prevent those dealing in realty from avoiding their mortgages "by simply assigning their rights to others and not taking legal title." Mihranian Inc. v. Padula, 134 N.J. Super. 557, 566 (App. Div. 1975). Mihranian is clear those principles apply when the mortgage or other lien in a property is granted before the promisor acquires title:

> Although there is nothing to which the lien can attach if the vendor has never at any time had an interest in the land, it is not fatal to its existence that the vendor had no interest when the contract was entered into so long as he subsequently acquires an interest. . . . Our courts

> have so held where the interest subsequently acquired by the vendor is legal title.
>
> [Id. at 565 (citations omitted).]

We conclude the trial court correctly granted Romspen an equitable mortgage on parcels G and H for its cost-sharing advances, as the loan documents are clear this was ADG's and Romspen's intent.

Moreover, even assuming Third State did not know Romspen had a first-priority lien on parcels G and H pursuant to the Romspen/ADG loan agreement and mortgage, it should have conducted appropriate due diligence given its actual knowledge of the cost-sharing lien and need for a release from Romspen. At minimum, Third State had constructive notice of Romspen's mortgage. The court's ruling that Romspen's equitable mortgage is senior to all but Third State's purchase money mortgage is sound and we affirm the trial court's findings.

To the extent we have not addressed appellants' remaining arguments we find they are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0489-21